ORIGINAL FILED
07 NOV 14 AM 11:30
CLERK, U.S. DISTRICT COURT, RICHARD W. WIEKING
NORTHERN DISTRICT OF CALIFORNIA

LAW OFFICES OF S. CHANDLER VISHER
S. Chandler Visher (California State Bar No. 52957)
44 Montgomery Street, Suite 3830
San Francisco, California 94104
Telephone: (415) 901-0500; Facsimile: (415) 901-0504
chandler@visherlaw.com

CONSUMER LAW OFFICE OF MARIE NOEL APPEL
Marie Noel Appel (California State Bar No. 187483)
44 Montgomery Street, Suite 3830
San Francisco, California 94104
Telephone (415) 901-0508; Facsimile: (415) 901-0504
marie@consumerlaw.ws

PUBLIC CITIZEN LITIGATION GROUP
Deepak Gupta (pro hac vice application to be filed)
Brian Wolfman (pro hac vice application to be filed)
1600 20th Street, NW
Washington, DC 20009
Telephone: (202) 588-7739; Facsimile: (202) 588-7795
dgupta@citizen.org; brian@citizen.org

Attorneys for plaintiff Julius Briggs

E-filing

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

WHA

| | |
|---|---|
| JULIUS BRIGGS, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA and ARMY AND AIR FORCE EXCHANGE SERVICE,<br><br>Defendants. | No. CV 07 5760<br>CLASS ACTION<br><br>**COMPLAINT TO ENJOIN ILLEGAL ADMINISTRATIVE OFFSETS AND FOR RESTITUTION OF AMOUNTS ILLEGALLY COLLECTED** |

## NATURE OF THE CASE

1. The Army and Air Force Exchange Service (AAFES), an instrumentality of the United States, issues credit cards, now known as Military Star cards, to military personnel to buy uniforms and make general purchases from the Post Exchange stores it operates. When repayment of debt on these cards is delinquent, the United States has the right to offset the delinquent debt against monies it owes the debtor for benefits and tax refunds. Each federal agency refers delinquent debt to the Department of the Treasury, which administers a centralized collection effort, using administrative offsets, known as the Treasury Offset Program (TOP). The delinquent debt that may be collected through TOP includes finance charges, penalties, and administrative costs, but only as permitted by the AAFES Credit Card Contract or applicable federal law. In addition, the offset collection procedure may only be used during the first 10 years after the debt becomes outstanding; after 10 years TOP collection is time barred. This action is brought on behalf of all those subjected to TOP collections by AAFES in the past six years on account of credit card debt and who fall into one or both of the following categories: (1) a portion of their TOP-collected debt had been outstanding for more than 10 years at the time of collection or (2) the total amount claimed due on their account was inflated because of improperly calculated finance charges and penalties.

2. Plaintiff seeks a judgment (1) granting an injunction against the future illegal use of TOP to collect debt outstanding for more than 10 years and (2) granting an injunction prohibiting AAFES from including improper finance charges and penalties in claims submitted to TOP and (3) granting all other appropriate equitable remedies, including restitution of all amounts improperly collected.

## PARTIES

3. Plaintiff Julius Briggs is a veteran of the United States Army. He served in the Army for 21 years: three years of active duty from 1975 to 1978, and Army Reserves from 1978 until 1996, including a six-month deployment in Saudi Arabia in the spring of 1991 in the aftermath of Operation Desert Storm. In 1993, during his reserve duty, Mr. Briggs incurred the AAFES debt that forms the basis of this lawsuit.

4. In 1977, during his active duty, Mr. Briggs injured his back, which has become progressively worse over the years, limiting his employment opportunities. Nevertheless, Mr. Briggs has attempted to find work when possible in security and loss prevention, a field of work not completely precluded by his back injury.

5. In 2000, Mr. Briggs began receiving military disability payments based on a partial service connected disability rating for his 1977 back injury. In spite of his efforts, Mr. Briggs has had some periods of financial difficulty, especially when his disability payments were delayed. His financial difficulties have left him homeless for several periods during the past few years. Between 2004 and 2007 Mr. Briggs had more than $2,300 in federal payments illegally withheld by TOP to pay AAFES credit card debt outstanding more than 10 years. The offsets have been made at a particularly difficult time for Mr. Briggs.

6. Mr. Briggs currently resides in San Francisco, California, in subsidized housing leased by Swords to Plowshares, a non-profit veterans' assistance organization, and the most recent administrative offset was made while he lived there.

7. Defendant United States is the creditor on all of the AAFES credit card debt illegally collected through TOP.

8. Defendant AAFES is a nonappropriated fund instrumentality of the United States with its executive offices at 3911 S. Walton Walker Boulevard, Dallas, Texas 75236. As noted above, AAFES operates retail stores for members of the armed services and a credit card program now known as Military Star.

## JURISDICTION

9. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1346(a)(2). The facts supporting jurisdiction are that plaintiff's causes of action arise under the AAFES Credit Card Contract which, by its terms, is governed by federal law. Applicable federal law includes 31 U.S.C. § 3701 through 31 U.S.C. § 3720E and the regulations promulgated pursuant thereto (collectively referenced herein as "FCCA" for Federal Claims Collection Act) and the Administrative Procedure Act (APA), 5 U.S.C. § 702.

10. Venue is proper in this District under 28 U.S.C. § 1391(e).

## INTRADISTRICT ASSIGNMENT

11. Pursuant to Civil L.R. 3-2 and 3-5(b), this action appropriately is assigned to the San Francisco Division of the Northern District of California because a substantial part of the events or omissions that give rise to the plaintiff's claims occurred, and the plaintiff resides, in the City and County of San Francisco.

## FACTS RELATING TO PLAINTIFF

12. In approximately November of 1993 plaintiff received and began using an AAFES credit card that allowed him to make purchases of uniforms and other goods on credit at stores operated by the AAFES.

13. The rights of defendants to impose finance charges, penalties, and other charges in connection with use of the AAFES credit card are governed by the AAFES Credit Card Contract, a copy of which is attached hereto as Exhibit A and incorporated herein by reference. The contract in Exhibit A was provided to plaintiff's counsel by AAFES in response to a request for plaintiff's contract. Plaintiff therefore believes, and on such belief alleges, that the contract in Exhibit A contains the terms of his credit card contract with AAFES. The credit card program has two plans: (1) the Uniform Clothing Deferred Payment Plan (UC) and (2) the Deferred Payment Plan (DPP). Purchases under the UC plan are for clothing; purchases under the DPP are for other goods.

14. Between the date he began using the AAFES credit card, November 12, 1993, and the date he stopped using it, December 16, 1993, plaintiff incurred charges for UC purchases of $348.19 and charges for DPP purchases of $1,508.89. Under the contract, the UC purchases are treated differently from the DPP purchases.

### TOP Collections on Claims Outstanding More Than 10 Years

15. Plaintiff's monthly AAFES credit card statement with a closing date of November 18, 1993, required him to make a minimum payment of $31 by December 13, 1993. Plaintiff did not make the $31 payment and thereafter made no further voluntary payment on the account.

16. Plaintiff's monthly AAFES credit card statement with a closing date of December 18, 1993, noted that the $31 payment had not been received and advised plaintiff that if the

payment was not received by January 18, 1994, the "account will be delinquent and payroll deductions will begin for the account balance." The balance was "outstanding" for time bar purposes on or before January 18, 1994.

17. Between January of 1994 and June of 1997 AAFES sent plaintiff billing statements on the account but took no other action to collect the outstanding balance. In June of 1997 AAFES referred the account to the Treasury Department for the purpose of deducting, through TOP, the outstanding balance from any payments that might be due plaintiff from the government. TOP searched for government tax refund or benefit payments due plaintiff from which the claim could be paid. Apparently TOP did not find any payments from which to make offsets for the AAFES claim until 2003, as shown in Exhibit B hereto.

18. AAFES used TOP to collect its claim against plaintiff after the 10-year time-bar period expired on January 18, 2004, as follows: $818.00 on January 30, 2004; $646.65 on February 18, 2005; $397.00 on February 17, 2006 and $511.30 on May 4, 2007. (See Exhibit B). Even though AAFES has collected in excess of $500 more than the principal on its claim, it still asserts that plaintiff owes it more than $4,000. Due to the errors in the way the AAFES calculated the balance due, considerably less than $4,000 was actually due after the offsets were made.

## Interest Rate and Penalty Calculation Errors

19. AAFES made errors in the way it calculated plaintiff's outstanding credit card account balance both before and after the referral to TOP in June of 1997, but the types of errors changed at the time of the referral, and the errors both before and after the referral to TOP were different for the UC balance than they were for the DPP balance. Because referral to TOP was simply a way to increase the chances of collecting the account, interest and penalty calculations on the account should not have changed simply because of the referral.

**UC Charge Errors**

20. On the overdue UC principal, the AAFES Credit Card Contract and the federal law it incorporated permitted AAFES to charge a 6% per annum penalty and administrative costs caused by the delinquency. No finance charge was permitted on the debt owed for UC

purchases. The administrative costs and penalties were assessed on a monthly basis, but the penalties and costs from prior months could not be included in the principal on which the 6% penalty was calculated; by law, the penalty had to be based only on the $348.19 UC principal.

21. Before referring plaintiff's account to TOP in 1997, AAFES improperly calculated the UC balance due by including prior penalty charges and administrative costs in the monthly balance used to calculate new penalties. By June of 1997 AAFES was using a principal of $495 to calculate the UC penalty, instead of the $348.19 UC principal.

22. After plaintiff's outstanding balance was referred to TOP in June of 1997, the AAFES stopped adding penalties and administrative costs to the principal amount on which it calculated the UC penalty, but used a constant principal of $422 (plaintiff does not know why it stopped using the $495 amount that it had been using before the referral) rather than the proper principal of $348.19 to make the penalty calculation.

23. After plaintiff's outstanding balance was referred to TOP in June of 1997, AAFES started charging a finance charge of 6% per annum on the UC principal (in addition to the 6% penalty), in direct violation of the contract requirement that no finance charge be imposed on the UC purchases.

**DPP Charge Errors**

24. On the overdue DPP portion of his credit card account balance, the AAFES Credit Card Contract and the federal law it incorporated permitted the same 6% per annum penalty and the assessment of administrative costs as for the UC portion. However, for DPP purchases, unlike UC purchases, AAFES was also permitted to impose an annual finance charge equal to the greater of 12% or the prime rate plus 4.75%.

25. Before referring plaintiff's account to TOP in 1997 AAFES improperly calculated the DPP balance due by (1) using an inflated principal balance due and (2) including previously imposed administrative costs in the balance on which finance charges and penalties were calculated. The original DPP principal was $1,508.89. The principal used by AAFES for the penalty and finance charge calculations was $1,773 in 1994 and increased to $1,873 by June of 1997. Unlike the UC penalty calculation, before referral to TOP, AAFES did not include prior

DPP penalties in the calculation of new DPP penalties.

26. After plaintiff's outstanding balance was referred to TOP, the way in which the AAFES calculated charges on the DPP balance changed. After June of 1997, AAFES improperly calculated the DPP balance due by (1) using an inflated principal balance on which finance charges and penalties were calculated and (2) imposing finance charges on the DPP principal that were more than those allowed by the AAFES Credit Card Contract. The original DPP principal that should have been used was $1,508.89. The principal AAFES used to calculate the finance charges and penalties was, in fact, approximately $1,785. The interest rate to calculate the finance charge for most months after referral to TOP should have been 12%; the actual rate used for all months was approximately 13.25%.

## CLASS ACTION ALLEGATIONS

27. Plaintiff brings this class action pursuant to Rule 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of two overlapping classes of persons similarly situated: The Time Bar Class includes persons subject to TOP collections for debts outstanding for more than 10 years, as alleged in the First Claim; the Overcharge Class includes persons subject to TOP collections whose debt was improperly calculated, as alleged in the Second Claim.

28. Plaintiff believes there are thousands of individuals with claims similar to plaintiff's, making the class so numerous that joinder of all members is impracticable, and that plaintiff's claims and defenses are typical of those of the class. The *Treasury Report on Receivables and Debt Collection Activities* for the second quarter of 2007 indicates that $9.3 billion out of $64.5 billion, or 14%, of government debt was outstanding more than 10 years. The Annual Reports for the Army and Air Force Exchange Service indicate that the total TOP collections of AAFES debt from 2001 through 2007 will be more than $450,000,000. If 14% of the TOP-collected AAFES debt, like the overall government debt, was outstanding more than 10 years, $60,000,000 in debt outstanding more than 10 years may have been illegally collected from the class in the past six years. Based on these numbers, if the size of plaintiff's debt is typical of the amounts collected from each class member, the Time Bar Class may well exceed

10% of the estimated 1.8 million Military Star card holders. Although the size of the Overcharge Class is more difficult to estimate, the large numbers of cardholders subject to TOP collection and the nature of the improper calculations of penalties and interest suggest that its size must be at least in the hundreds. The members of each class can be identified through records maintained by defendants.

29. Plaintiff will fairly and adequately protect the interests of the classes. Plaintiff has no interests that conflict with the interests of either class, and plaintiff has engaged competent counsel experienced in class actions, complex litigation involving the federal government, and the administrative offset program.

## FIRST CLAIM
### (Collection of Debt Outstanding More than 10 Years)

30. Plaintiff incorporates herein by reference paragraphs 1 – 29.

31. Under the FCCA, federal agencies may refer debts for collection by administrative offset to TOP.

32. 31 U.S.C. § 3716 (e) provides that "(e) This section does not apply – (1) to a claim under this subchapter that has been outstanding for more than 10 years." The debts of plaintiff and the Time-Bar Class that AAFES referred to TOP were "claims" under the subchapter and thus subject to the 10-year limitation.

33. Plaintiff had a credit card account with AAFES. The December 1993 account statement, attached hereto as Exhibit C, indicates that plaintiff's account was "outstanding" by January 18, 1994, at the very latest. The total principal amount of the AAFES claim against plaintiff by defendant United States was $1,857.08, all for charges incurred in the five-week period between November 12, 1993 and December 16, 1993. All other credit card debt amounts the United States claimed were due from plaintiff were for finance charges, penalties, and administrative costs.

34. TOP collection of plaintiff's AAFES credit card debt was permitted until, at the very latest, January 18, 2004, 10 years after the last possible date plaintiff's debt became outstanding.

35. After January 18, 2004, AAFES used TOP to collect money from tax refunds due plaintiff, as shown in the offset report attached hereto as Exhibit B. All of the TOP collections listed in paragraph 18 above were made after January 18, 2004, and thus were made more than 10 years after the debt became outstanding.

36. Referral to TOP of claims outstanding more than 10 years constitutes unlawful agency action under the Administrative Procedure Act, 5 U.S.C. § 706(2).

37. Defendants have refused to refund any portion of the money illegally taken through TOP from plaintiff between 2004 and 2007. Defendant AAFES contends all TOP collections on its claim against plaintiff were lawful because the time bar is not effective until for 10 years after the *first referral to TOP*, which was in 1997, not 10 years after the debt was outstanding, which was in 1994. (See Exhibit D attached hereto).

38. The AAFES continues to refer debt outstanding more than 10 years to TOP. Thus, if the AAFES and the United States are not enjoined from making illegal offsets, there will continue to be violations of the FCCA.

39. The class of persons plaintiff represents for this claim (the Time-Bar Class) is defined as: All natural persons (1) who were, or will in the future, be subjected to TOP collection, within six years preceding the filing of the Complaint herein, of an AAFES credit card debt claim and; (2) from whom a portion of that TOP collection violated or violates the 10-ten year limitation in 31 U.S.C. § 3716(e).

40. There are questions of law and fact common to this Time-Bar Class, including the following:

i. When a debt first becomes "outstanding" within the meaning of the 10-year time bar of 31 U.S.C. § 3716 (e)(1).

ii. Whether the defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

\\\

\\\

## SECOND CLAIM
### (Correction of Credit Card Balances and Restitution of Illegally Offset Finance Charge and Penalty Amounts)

41. Plaintiff incorporates herein by reference paragraphs 1 – 29.

42. Plaintiff incurred debt obligations through use of an AAFES credit card. Finance charges, penalties, and administrative costs on such debt are governed by the AAFES Credit Card Contract.

43. The AAFES Credit Card Contract (Exhibit A) provides in paragraph 14 that balances more than 90 days delinquent may, pursuant to 31 U.S.C. § 3717, be subject to administrative fees "to cover the cost of processing and handling a delinquent claim" plus a 6% annual penalty. The penalty and administrative costs are required to be applied in the same manner, but separately, to the UC and the DPP purchases on the account.

44. The AAFES Credit Card Contract (Exhibit A) provides in paragraph 7 that there is "no periodic FINANCE CHARGE assessed against" the UC purchases.

45. Paragraph 8 of the AAFES Credit Card Contract (Exhibit A) provides that finance charges will be applied to DPP purchases on the account using an annual interest rate that may be the greater of 12% or the prime rate plus 4.75%. AAFES included all finance charges, penalties, and administrative costs on monthly statements to cardholders.

46. The AAFES Credit Card Contract also provides in paragraph 8 that AAFES may "choose not to implement an increase in the rate." From the inception of plaintiff's account in November of 1993 until his debt was referred to TOP in June of 1997, AAFES chose to use, and by such election was required to use, the 12% interest-rate provision of the Contract to determine finance charges owed by plaintiff, although during parts of that period it could have elected to use a higher rate.

47. Neither prior unpaid finance charges nor prior penalties may be included in the principal on which subsequent penalties or finance charges are calculated; paragraph 6 of the AAFES Credit Card Contract excludes unpaid finance charges from the calculation of the daily principal balance on which new finance charges are computed monthly, and 31 U.S.C. 3717 does not allow the inclusion of prior penalties when calculating subsequent penalties.

48. The finance charge permitted under the AAFES Credit Card Contract and the penalty allowed by the Contract and 31 U.S.C. § 3717 must be calculated using the principal amount of DPP items purchased on the account, and the principal used for the calculation may not include prior penalties, finance charges, or administrative costs imposed on the account.

49. Any claims against plaintiff for finance charges or penalty amounts in excess of those permitted by the AAFES Credit Card Contract or 31 U.S.C. § 3717 are unlawful and may not be the subject of administrative offset pursuant to 31 U.S.C. § 3716.

50. The class of persons plaintiff represents for this claim (the "Overcharge Class") is defined as: All natural persons (1) from whom AAFES has collected or is collecting using TOP, within the past six years, debt incurred on an AAFES credit card and; (2) with respect to whom the amount claimed due exceeded or exceeds the principal amount of purchases plus finance charges, penalties, and administrative costs permitted by the AAFES Credit Card Contract and; (3) from whom the amount actually collected exceeded or exceeds the principal amount of the purchases. The Overcharge Class does not include persons for whom illegal TOP collections exceeded $10,000.

51. Between the time their accounts became 90 days delinquent and the time the debts were referred to TOP, AAFES imposed finance charges and penalty amounts due from plaintiff and the Overcharge Class in excess of those properly due pursuant to the AAFES Credit Card Contract or 31 U.S.C. § 3717, and then included those improperly imposed amounts as part of the claim it referred to TOP between 2001 and 2007. The AAFES claims submitted to TOP overstated the balance due at the time of first referral to TOP:

i. By including prior penalties and administrative costs in UC principal on which it calculated the 6% penalty;

ii. By using an improperly high DPP initial principal to calculate the monthly finance charges and penalties;

iii. By adding accrued administrative costs to the initial principal to calculate the DPP monthly finance charges and penalties.

52. Starting at the time of referral of the claims against plaintiff and the Overcharge

Class to TOP, AAFES changed the ways in which it improperly calculated amounts due from plaintiff and the Overcharge Class and then included those improperly imposed amounts as part of the balance it sought to collect through TOP starting in 2001. For time periods after a claim's first referral to TOP the AAFES claims submitted to TOP overstated the balance due:

i. By charging 6% interest (separate from the penalty) on the UC principal, when no interest was allowed to be charged;

ii. By using an improperly high UC principal on which to calculate the 6% penalty;

iii. By using an improperly high DPP principal to calculate the DPP finance charge and penalty;

iv. By using a DPP finance charge interest rate that was in excess of that permitted by the AAFES Credit Card Contract.

53. Plaintiff and the Overcharge Class have had moneys due from defendant United States for tax refunds and governmental benefits withheld from them through TOP on account of AAFES credit card claims. The claims on which these offsets were based included overstated amounts of finance charges and penalties.

54. Plaintiff and the Overcharge Class must have their AAFES credit card balances due corrected and, as necessary, are entitled to restitution of any amounts illegally withheld due to improper credit card balance calculations.

55. There are questions of law and fact common to this Overcharge Class, including the following:

i. Whether interest may be charged, pursuant to the AAFES Credit Card Contract, on UC purchases, and, if not, whether the defendants improperly included amounts on account thereof in claims referred to TOP;

ii. Whether finance charges may be imposed pursuant to the AAFES Credit Card Contract on administrative costs, and, if not, whether the defendants improperly included amounts based on such charges in claims referred to TOP;

iii. Whether the principal on which penalties are calculated may include prior penalties or administrative costs imposed on the debt, and, if not, whether the defendants improperly included such improper penalty amounts in claims referred to TOP;

iv. Whether finance charges exceeding 4.75% plus the prime rate (or such lower rate as the AAFES has chosen to impose) may be imposed on DPP purchases, and whether the defendants improperly included such excessive finance charges in claims referred to TOP;

v. Whether the defendants have acted or refused to act on grounds generally applicable to the Overcharge Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Overcharge Class as a whole.

**WHEREFORE**, plaintiff requests that this Court:

A. Enjoin AAFES from making referrals of claims outstanding more than 10 years to TOP in violation of 31 U.S.C. § 3716(e);

B. Require defendants to make restitution of all illegal TOP collections to the Time-Bar Class;

C. Require defendants to make restitution of all illegal TOP collections to the Overcharge Class and to correctly state any delinquent balances of the Overcharge Class in claims referred to the TOP and;

D. Grant any additional relief, including attorney fees, expenses, and costs and including any appropriate relief under 28 U.S.C. § 2412, to which the plaintiff may be entitled.

Dated: November 14, 2007

Respectfully submitted,

LAW OFFICES OF S. CHANDLER VISHER
CONSUMER LAW OFFICE OF MARIE NOEL APPEL
PUBLIC CITIZEN LITIGATION GROUP

By: [signature]
S. Chandler Visher, Esq., Attorneys for Plaintiff

EXCHANGE CREDIT PROGRAM AGREEMENT (TERMS AND CONDITIONS)

| ANNUAL PERCENTAGE RATES | As of ______ (today's date) _____% for purchases. _____ Customer Initials |
|---|---|
| Variable Rate Information | The ANNUAL PERCENTAGE RATE for purchases may vary each billing cycle. We will calculate the variable rate by adding 4.75 to the rate disclosed as the U.S. Prime Rate reported in the "Money Rates" section of The Wall Street Journal on the last day of your billing cycle. The ANNUAL PERCENTAGE RATE will be applied to the next billing cycle. This rate will not be lower than 12%. |
| Grace Period | 25 days |
| Minimum FINANCE CHARGE | 50 cents |
| Method of Computing Balances | Average Daily Balance (does not include new purchases) |
| Annual Fee | None |
| EXCHANGE UNIFORM CLOTHING DEFERRED PAYMENT PLAN (UCDPP) TERMS | |
| ANNUAL PERCENTAGE RATES | There is no interest charge added on this account. |
| Annual Fee | None |

## *** IMPORTANT NOTICE ***

(Continued on Reverse Side)

THIS AGREEMENT CONTAINS THE TERMS AND CONDITIONS THAT GOVERN YOUR PARTICIPATION IN THE EXCHANGE CREDIT PROGRAM, A CREDIT PROGRAM THAT IS OFFERED TO ALL ELIGIBLE CUSTOMERS OF AAFES AND PARTICIPATING SERVICE EXCHANGES. THE EXCHANGE CREDIT PROGRAM IS ADMINISTERED BY THE ARMY AND AIR FORCE EXCHANGE SERVICE (AAFES). THE EXCHANGE CREDIT PROGRAM IS THE ONLY DIRECT CREDIT PROGRAM OFFERED TO ELIGIBLE EXCHANGE CUSTOMERS FOR NEW PURCHASES OF GOODS AND SERVICES. THE PROGRAM OFFERS TWO PLANS. THIS AGREEMENT APPLIES TO BOTH PLANS: THE DEFERRED PAYMENT PLAN (HEREAFTER "EXCHANGE DPP") AND THE UNIFORM CLOTHING DEFERRED PAYMENT PLAN (HEREAFTER "EXCHANGE UCDPP"). ALL PLANS ARE GOVERNED BY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.

1. SCOPE OF AGREEMENT. This Agreement governs the terms and conditions of your participation in the EXCHANGE CREDIT PROGRAM. The words "you" and "your" refer to any person who signs an application for an account under the EXCHANGE CREDIT PROGRAM as described in this document. "We," "us" and "our" refer to the Army and Air Force Exchange Service (AAFES), which offers the EXCHANGE CREDIT PROGRAM and any person to whom this Agreement may be assigned. Unless otherwise specified, when used in this Agreement, "Account" means your EXCHANGE DPP/UCDPP account.

2. ACCEPTING THE AGREEMENT. Upon AAFES account approval, you agree to be bound by these terms and conditions for any purchase made by you or anyone you authorize, (apparent or implied), to use your account.

3. CREDIT LIMITS, MONTHLY PAYMENTS AND MERCHANDISE RETURNS. We will establish DPP credit limits and monthly payment limits based on your income, credit history and Expected Time of Separation (ETS) or End of Active Service (EAS) date. We may reduce your credit limit prior to your ETS/EAS date. A change in your income or your spouse's income, may result in a reduction of your credit limit. An authorized family member who subsequently opens their own account may result in a reduction of your credit limit. We will also establish UCDPP credit limits and monthly payments for eligible military members. Your indebtedness to us for purchases under these plans may not exceed these limits. Your credit limits will be shown on your monthly statement of account. Increases or decreases to the credit limit will be based upon your performance in the exchange credit program. Merchandise purchased under this agreement cannot be returned for a cash refund. Returned merchandise will result in a credit to your account.

4. IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR BILL. The Federal Truth in Lending Act requires prompt correction of billing errors. If you think your bill is wrong or you need more information about an item on your bill, write on a separate sheet of paper to our address shown on your bill. We must receive your inquiry within 60 days after we sent you the bill on which the problem appeared. You may call us, but doing so will not preserve your rights. In your letter, give us:

a. Your name and account number:
b. The amount of the suspected error:
c. A description of the error and why you believe it is an error.

Describe any item you are unsure about. You don't have to pay amounts in question while we are investigating, but you are obligated to pay the parts of your bill that aren't in question. While we investigate, we cannot report the amount in question as delinquent to any credit agency nor can we take any action to collect that amount.

5. SPECIAL RULES FOR DPP CREDIT CARD PURCHASE. If you have a problem with the quality of property or services that you purchased on account, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or service. There are two limitations

a. You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address; and

b. The purchase price must have been more than $50.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

6. FINANCE CHARGE COMPUTATION. If you pay the revolving balance shown on this bill by the due date, there will be no additional FINANCE CHARGE. If you choose to extend payments, a FINANCE CHARGE will be computed as follows:

a. We start with the previous revolving balance less unpaid FINANCE CHARGES.

b. Each day we subtract credits posted to your account. We do not add new purchases in this computation. This gives us your daily balances.

c. We sum the balances and divide that sum by the number of days in the billing cycle to determine your average daily balance.

d. The average daily balance is multiplied by the periodic rate for that monthly billing cycle.

7. NO FINANCE CHARGE ON UCDPP. There is no periodic FINANCE CHARGE assessed against the EXCHANGE UCDPP or the AAFES UCDPP.

8. PERIODIC RATE AND ANNUAL PERCENTAGE RATE FOR EXCHANGE DPP. Your account has a variable interest rate and the ANNUAL PERCENTAGE RATE (corresponding to the periodic rate) may change as a result. If the rate increases, there will be a corresponding increase in your minimum payment and in the FINANCE CHARGES. For each monthly billing period, the ANNUAL PERCENTAGE RATE will be the "Account Prime Rate" in effect for that billing period plus four and seventy-five hundredths (4.75%) percentage points. The "Account Prime Rate" will be the rate published and announced as the "Prime Rate" in the "Money Rates" section of The Wall Street Journal ("the Journal") on the Closing Date of your billing cycle. The Closing Date of your billing cycle is shown on your billing statement. If your Closing Date is not a business day, the "Account Prime Rate" will be the rate published as the "Prime Rate" in the Journal on the preceding business day. After we compute the applicable rate, it will be applied to your Account on the first day of your next billing period, if there was no previous DPP balance or in a monthly billing period during which payment and/or credits equal or exceed the previous balance. Otherwise, it will be applied from the date of purchase. The periodic rate shall not be less than a periodic rate with a corresponding ANNUAL PERCENTAGE RATE of 12.00%. The effect of the variable interest rate is that your minimum payment will increase or decrease based on increases or decreases in the ANNUAL PERCENTAGE RATE. For purposes of this section, "business day" shall mean every day other than a Saturday, Sunday or a Federal Bank holiday. If we choose not to implement an increase in the rate, you agree and understand that this shall not affect our right to implement increases at a later date, and shall not constitute a waiver, an amendment or change in terms of the Agreement.

9. GRACE PERIOD—NO FINANCE CHARGE IS ASSESSED. No FINANCE CHARGE is assessed in a monthly billing period during which there was no previous DPP balance or in a monthly billing period during which payments and/or credits equal or exceed the previous balance. You may pay your entire balance at any time without incurring additional FINANCE CHARGES.

10. MINIMUM CHARGE. If the amount of the FINANCE CHARGE due for any billing period is less than fifty cents ($.50), a minimum FINANCE CHARGE of fifty cents ($.50) will be charged for the billing period.

11. FEES. We may charge a $15 fee to your account if you have exceeded your account limit at the time the billing statement is generated. We may charge a $5 fee for each statement and/or charge ticket you request. We may charge a $25 fee for special credit reporting performed at your request.

12. MONTHLY BILLING. We will send you a monthly statement for each billing cycle in which there is account activity or your balance owed is greater than $1.00. The statement will show your beginning balance, detail transactions for the billing cycle, FINANCE CHARGES, if any, and the new account balance(s). The statement will also show the payments due for each active payment plan, the total payment due for the billing period and the payment due date. Your monthly payments on each of your plan(s) and your total monthly payment due us are determined as follows:

a. When you make a purchase under the Exchange DPP, your monthly payment is determined based on a 36-month payback period, including new purchases and interest. Each month, you will be required to pay at least the minimum payment as reflected in your monthly billing statement. When your balance is less than $10, you must pay us your total balance.
b. When you make a purchase under the Exchange UCDPP, your monthly payment is determined based on an 8-month payback period, including new purchases. Each month, you will be required to pay at least the minimum payment as reflected in your monthly billing statement. When your balance is less than

suspended when you are within 3 months of your ETS/EAS.

c. The monthly payments for all active credit plans are added together and the sum becomes the total payment due for the billing period. This total is shown on your statement as "Payment Due" and is the minimum amount that you must pay to us for that billing period. You may at any time pay your entire balance in full or more than the minimum payment. We will apply payments received by mail in the following priority and sequence: first to any overdue UCDPP/DPP payment; then to the minimum payment due on UCDPP/DPP account. Any additional amounts will be allocated between UCDPP/DPP accounts based on the minimum amount due.

d. The following charges may be assessed as a purchase in the month in which a payment check is returned as dishonored: the value of the returned payment check, plus an administrative fee, plus bank fees. The administrative fee and bank charges will still be assessed if the check is later paid upon subsequent presentment. We may also charge an administrative fee if any automatic debit fails to be paid.

13. IRREGULAR PAYMENTS. We will accept and post payments marked as "PAYMENT IN FULL" or with similar words; however, acceptance of checks or money orders with such words does not constitute acknowledgment by us that the account is paid in full.

14. ASSESSMENT ON DELINQUENT BALANCES. Under the provisions of 31 U.S.C. 3717, we will assess on a delinquent debt, in addition to interest accruals on the outstanding balance: (1) an administrative fee to cover the cost of processing and handling a delinquent claim; and (2) a penalty charge of 6 percent annually for failure to pay any part of this amount more than 90 days past due.

15. LATE PAYMENTS. If we do not receive your payment by the due date, your account will be considered overdue. **If your account becomes delinquent, you consent to the maximum deduction allowable from military or retired pay under the authority of DoDPM Chapter 7, or from your civilian pay under the provisions of 5 U.S.C. 5514 or any provision of the Debt Collection Act.**

16. SUSPENSION OF EXCHANGE CREDIT PROGRAM PRIVILEGES. If payment is not made within 30 days after the due date, your account will be considered delinquent, at which time the Exchange Credit Program charge privileges and check presentation privileges may be withdrawn. Your unit commander or work supervisor may be notified and asked to assist in collection. If payment is not made within 60 days after the due date, the entire account balance becomes due. In the event your privilege to write a personal check for merchandise or cash is suspended for reasons other than account delinquency, charge privileges will also be suspended, even if your account is not in an "overdue" or "delinquent" status.

17. VOLUNTARY REPAYMENT. At any time your account is delinquent, AAFES can work with you to establish voluntary repayment of account balances.

18. CONTINUING OBLIGATION BEYOND EXPECTED TIME OF SEPARATION (ETS/EAS). You may not make purchases on the Exchange DPP after your ETS/EAS date. If your ETS/EAS date changes, notify us. If you no longer have exchange privileges, you may pay off the obligation over the normal time period.

19. ELIGIBILITY FOR DPP AFTER ACTIVE DUTY. Those individuals who separate from active duty military status and maintain exchange privileges are eligible to continue in the Exchange Credit Program.

20. PENDING SEPARATION. (a) Under other than normal conditions, in the absence of a separate written agreement between you and us for voluntary repayment of your account balance(s), we may request the U.S. Armed Services, or other organizations for civilian personnel, to withhold from your pay for payment to us, an amount equal to the balances owed in connection with your obligations under this Agreement in the event we are notified of your pending separation from military/civilian service under other than normal conditions. (b) If you are an Exchange employee separating under normal conditions and your account is delinquent, your final pay may be offset in an amount required to satisfy the entire balances owed. Exchange employees separating under such conditions waive procedural due process for administrative offset under 31 USC 3711 and 31 USC 3716.

21. DISCLOSURE TO CREDIT AGENCY. We may disclose your account activity to a consumer reporting agency. Under the provisions of 31 U.S.C. 3711(f), we may disclose your indebtedness to a consumer reporting agency should it become delinquent.

22. IRS OFFSET. Your delinquent debt may be submitted for deduction from any Federal Income Tax refund to which you may be otherwise entitled under provisions of the Deficit Reduction Act, 26 U.S.C. 6402(d) and 31 U.S.C. 3720(a).

23. SECURITY INTEREST. To the extent permitted by law, we retain a security interest in all merchandise charged to your Account under the EXCHANGE DPP. You grant AAFES a purchase money security interest under the Uniform Commercial Code (UCC) in the merchandise. You will be in default if you do not make payments when due.

24. SECURED PARTY REMEDIES. AAFES has all remedies of a secured party under the UCC. Those remedies include the right to retake possession of the merchandise if you are in default under this Agreement. Upon any default, you will, at AAFES' request, take the merchandise to the nearest Exchange. You will be in default if you sell or otherwise dispose of the merchandise without AAFES' written consent.

25. FAMILY MEMBER AUTHORIZATION. The account holder may authorize family members 18 years of age or older to use the account(s) by identifying them in the application. Withdrawal of family member authorization must be requested by the account holder in writing. A written request is also required when the account holder rescinds a General Power of Attorney previously provided to a family member.

26. LIABILITY OF CARDHOLDER FOR UNAUTHORIZED USE. Unauthorized use means the use of a DPP card by a person, other that the cardholder, who does not have actual, implied, or apparent authority for such use, and from which the cardholder received no benefit. The liability of a cardholder for unauthorized use shall not exceed the lesser of $50 or the amount of money, property, labor, or services obtained by the unauthorized use before notification to the card issuer.

27. NOTIFICATION OF LOST OR STOLEN CARD. You agree to notify us as soon as practicable if your DPP card is lost or stolen. Notification may be made by calling our toll-free number, in writing, or in person at the Customer Service area of a main exchange. You agree to provide us with pertinent information about the loss, theft, or possible unauthorized use.

28. ASSIGNMENT OF ACCOUNT. We may sell or assign all or any part of your Account to another creditor without further notice to you. If we do, the notice below, which is required by federal law, is intended to protect any claim or right you have against us.

**NOTICE. ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH YOU THE DEBTOR COULD ASSERT AGAINST US THE SELLER OF THE GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

29. CANCELLATION. We may cancel this Agreement as it relates to future purchases at any time.

30. CHANGING THESE TERMS AND CONDITIONS. To the fullest extent permitted by applicable law, we reserve the right to change any term or part of this Agreement (including the amount and method of calculating the FINANCE CHARGE) at any time. Except for changes in the variable interest rate, we will provide you notification of any changes at least 30 days before the effective date of the change. Any change in terms will apply to your account on the effective date of the change and will apply to transactions made on or after the effective date, as well as to any outstanding balance(s). If the change has the effect of increasing your FINANCE CHARGE, the periodic interest rate or other fees or charges, the change will not apply if: (1) You notify us in writing within the period of notification specified in the change that you do not agree to accept such change; and (2) You do not use your account for purchases on or after the effective date specified in the notice of change. Use of the account for purchases on or after the date of the change will constitute your acceptance of the terms specified in the change.

31. CHANGE OF ADDRESS. If you move, you must give us written notice of your new address. If you do not send us written notice of your change of address, any notice sent by us to you at your address of record with us shall be effective notice to you. If you move and do not provide us notice of your change of address, we may suspend account charging privileges.

32. NOTICES. Unless otherwise required by law or the credit documents creating your account, all notices to you may be hand delivered or mailed to you at your address of record which is your address on your application for the Account, unless written notification of change has been received, and shall be deemed given when hand delivered or deposited in the mail. Notices to us will not be deemed given until received in writing at our offices at the following address:

Army and Air Force Exchange Service (AAFES)
P.O. Box 650524
Dallas, TX 75265-0524

**DPP Service Telephone Numbers**

CONUS (Includes Alaska & Hawaii) 1-800-826-1317

| | |
|---|---|
| GERMANY 0130-81-2469 (Toll-free) | NORWAY 214-312-6030 Collect |
| ITALY 1678-72683 (Toll-free) | CRETE 214-312-6030 Collect |
| UNITED KINGDOM 0800-96-1843 (Toll-free) | NETHERLANDS 214-312-6030 Collect |
| BELGIUM 0800-1-6374 (Toll-free) | OKINAWA (Toll-free) 0031-114239 |
| TURKEY 214-312-6030 Collect | KOREA (Toll-free) 0078-11-276-0826 |
| SAUDI 214-312-6030 Collect | JAPAN (Toll-free) 0031-114239 |
| SPAIN 214-312-6030 Collect | GUAM (Toll-free) 01800-546-7195 |

AAFES FORM 6450-26 (Rev May 96) Previous Editions Obsolete
Item No. 752545026 CRC No. 515-7615



# US Department of the Treasury
# Financial Management Service
# Offset Report as of 7-25-2007 12:21 pm

| | | | |
|---|---|---|---|
| **Debtor TIN:** [redacted]3755 | **Debt Status:** C | **Subject to Offset?** No | |
| **Debtor Name:** BRIGGS, JULIUS L. | **Debt Type:** 15 | **Offset Count:** 5 | |
| **Agency ID:** 15 **Agency Site ID:** E1 | **Local:** No | **Reversal Count:** 0 | |

**Agency Site Name/Address:**
Army & Air Force Exchange Service
Attn: FA-F/R
P. O. Box 650038
Dallas, TX 752650038

**Debt Phone:** 8006544074
**State Phone:** Toll Free
**State Coll Phone:** (800) 654-4074
**National Coll Phone:** (800) 654-4074

| | Payment Date | Payment Amount | Offset Amount | Payee Name / Address | Agency Site Id | Payment Type | Reversal |
|---|---|---|---|---|---|---|---|
| 1 | 4/18/2003 | $411.84 | $411.84 | JULIUS L BRIGGS<br>2545 POLK ST<br>GARY IN<br>464073927 | E1 | IC | |
| 2 | 1/30/2004 | $818.00 | $818.00 | BRIGGS, JULIUS L<br>2545 POLK ST<br>GARY IN<br>464073927 | E1 | IE | |
| 3 | 2/18/2005 | $646.65 | $646.65 | BRIGGS, JULIUS L<br>1826 E 19TH PL<br>GARY IN<br>464071620 | E1 | IE | |
| 4 | 2/17/2006 | $397.00 | $397.00 | BRIGGS, JULIUS L<br>109 S HURON ST APT 2<br>YPSILANTI MI<br>481975453 | E1 | IE | |
| 5 | 5/4/2007 | $511.30 | $511.30 | JULIUS L BRIGGS<br>1060 HOWARD ST<br>SAN FRANCISCO CA<br>941032820 | E1 | IC | |

**IMPORTANT!! PLEASE RETAIN FOR YOUR RECORDS**

AAFES
ATTN: DPP SERVICES CTR
P O BOX 650524
DALLAS, TX 75265-0524

| ACCT NO. | PMT DUE BY | PMT DUE |
|---|---|---|
| -3755 | 12 JAN 94 | 126.00 |

PAST DUE, PLEASE PAY IMMEDIATELY: $31.00

ENTER CK AMT
$

JULIUS L. BRIGGS
422 VALENCIA ST #319
SF, CA 94103

00 7550000018661900012600

| ACCT NUMBER | PMT DUE BY | BILL CYCLE DAYS | CLOSING | | DPP | UCDPP |
|---|---|---|---|---|---|---|
| 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 | 12 JAN 94 | | | ACCT LIMIT | 1000.00 | 500.00 |
| | | 30 | 18 DEC 93 | AVAIL LIMIT | NONE | 151.81 |

| DATE | REF NO. | DESCRIPTION | AMOUNT |
|---|---|---|---|
| 27 NOV 1993 | 02151406 | 4790101000 DPP CHARGE | 122.15 |
| 27 NOV 1993 | 7667474 | 4790125000 DPP CHARGE | 169.20 |
| 05 DEC 1993 | 02162012 | 4790101000 DPP CHARGE | 191.25 |
| 13 DEC 1993 | 02180356 | 4790101000 DPP CHARGE | 115.00 |
| 15 DEC 1993 | 02141611 | 4790125000 UCDPP CHARGE | 154.03 |
| 16 DEC 1993 | 02140204 | 4790125000 UCDPP CHARGE | 194.16 |
| 18 DEC 1993 | 15233153 | 3732410800 DPP FINANCE CHARGE | 9.11 |

NOTICE: ADMINISTRATIVE FEES AND PENALTIES WILL BE ASSESSED ON DELINQUENT ACCOUNTS AS AUTHORIZED BY 31 U.S.C. 3717.

FOR CUST SERV CALL: 1-800-826-1317 MON-FRI 0730-2000***

| SUMMARY | DPP * | UCDPP | | TOTAL |
|---|---|---|---|---|
| PREV BALANCE | 911.29 | .00 | | 911.29 |
| CHARGES | 597.60 | 348.19 | | 945.79 |
| PAYMENTS | .00 | .00 | | .00 |
| ADJUSTMENTS | .00 | .00 | | .00 |
| FIN CHARGES | 9.11 | | | 9.11 |
| NEW BALANCE | 1518.00 | 348.19 | | 1866.19 |
| AVG DAILY BAL | 911.29 | | | |
| ANNUAL % RATE | 12.00 | | | |
| MTHLY PER RATE | 1.00 | | | |
| PAYMENT DUE | 82.00 | 44.00 | | 126.00 |
| PAST DUE PMT | 31.00 | .00 | | 31.00 |

3732041080

*** OVERDUE NOTICE ***

PAYMENT OF $31.00 FROM PREVIOUS STATEMENTS HAS NOT BEEN RECEIVED. IF THE AMOUNT IS NOT RECEIVED BY 04 JAN 94, OVERDUE NOTIFICATION WILL BE SENT TO YOUR UNIT COMMANDER/WORK SUPERVISOR. IF PAYMENT IS NOT RECEIVED BY 18 JAN 94, YOUR ACCOUNT (*) WILL BE DELINQUENT AND PAYROLL DEDUCTIONS WILL BEGIN FOR THE ACCOUNT BALANCE. CHARGE PRIVILEGES ARE SUSPENDED PENDING RECEIPT OF THE OVERDUE AMOUNT.

***K 13***

AAFES

Army & Air Force Exchange Service
Office of General Counsel (GC)
P.O. Box 650060
Dallas, TX 75265-0060
(214) 312-3641
GC-G&R

MAY 24 2007

Consumer Law Office of Marie Noel Appel
44 Montgomery Street, Suite 3830
San Francisco, CA 94104

Re: Account [redacted]755, Julius Briggs

Dear Ms. Appel:

I am responding to your letter dated May 14, 2007 concerning your client, Julius Briggs, and the debt he owes to the Army and Air Force Exchange Service (AAFES), a non-appropriated fund instrumentality of the United States.

Your letter states that Mr. Briggs' debt has been delinquent since December 1993 or January 1994 and that offsets of Mr. Briggs' tax returns occurred outside the 10 year limitation for collection of federal debts. For the reasons stated below, AAFES disagrees.

Mr. Briggs had a Military Star account (formerly called DPP) with AAFES. This is a credit card wholly owned and managed by AAFES. AAFES records show that Mr. Briggs' account went delinquent in January 1994 and collection action by AAFES was attempted. At this point Mr. Briggs' debt was a nontax debt owed to the United States as defined in 31 U.S.C. 3117(g)(1). There is no time period for collection in this statute. Rather, it provides that if such a debt is delinquent for a period of at least 180 days, it must be submitted to the U.S. Department of Treasury for administrative offset. The 10-year period referred to in your letter, 31 U.S.C. 3716(e)(1), is specifically applicable only to administrative offset by Treasury.

AAFES records show that Mr. Briggs debt was placed into Treasury collection on June 18, 1997. The debt will no longer be eligible for Treasury offset as of June 17, 2007. Offsets taken prior to that date will not be refunded.

Sincerely,

[signature]

MARY L. WALDSMITH
Associate General Counsel
General & Revenue Recovery Law Division